## THE STATE ex rel. FATH et al. v. HENDERSON, Judge of Probate.

### In Banc, February 19, 1901.

1. **Certiorari: WHEN GRANTED.** The granting of the writ of *certiorari* by this court is discretionary. And in this case, where a statute imposing a collateral inheritance tax is assailed as being unconstitutional, it is held that a pressing reason exists for the issuing of the writ to the probate court where the estate affected is being administered.

2. **State Revenues:** ONE GENERAL FUND. The Constitution does not require all revenues of the State to first go into one common or general fund, to be then disbursed in the order named in section 43, article 4, Constitution. That section simply requires the General Assembly to proceed in the order there designated in passing its appropriation bills. It does not mean that the Legislature may not provide a tax for a public purpose, and require it to be paid into the State Treasury and set apart in a special fund subject to a subsequent appropriation for the purposes for which it was levied.

3. ———: APPROPRIATIONS: PRIORITY. By prescribing an order for the passage of appropriation bills, the Constitution did not create special liens upon the moneys in the State Treasury or give any priority of payment of one appropriation over another. Nor must the full amount of the appropriation for each purpose in that order named be collected and set apart before the next in order can be paid.

4. **Collateral Inheritance Tax:** ACT OF 1899. The Act of April 19, 1899, which imposes a tax of five per cent on the estates of all persons who at the time of their death have no father, mother, wife, legally adopted child or direct lineal descendant, to be a first lien in favor of the State of Missouri, is constitutional, and a valid statute.

5. ———: ———: PERPETUAL APPROPRIATION OF REVENUE: PRIORITY OF APPROPRIATIONS. The fund raised by said act can not be paid out of the State Treasury without a special act of the Legislature directing its disbursement. The money raised thereunder is not by the act itself instantly and perpetually appropriated to the maintenance of the State University or to public education. The act is not an appropriation bill, but one to provide a tax to create a special fund, which can be withdrawn from the treasury only by a subsequent appropriation bill duly enacted, and hence, it in no way conflicts with the constitutional order of priority for passing appropriation bills.

6. ———: UNIFORMITY: SUCCESSION TAX. Said statute in imposing a collateral inheritance tax, does not impose a tax on the property of the devisor, intestate or grantor in addition to the burden it must bear in common with all other property, but it is a tax levied only on the transmission of the property by will, descent or grant. It is a bonus or duty levied upon the right or privilege of the devisee, heir or distributee of receiving his share. It is not a strict property tax, but a succession tax.

7. ———: ———: ARBITRARY CLASSES. The selection of collateral kindred as a class for taxation and exempting the lineal descend-

ants of the devisor, etc., is not an unlawful or arbitrary classification. And hence such statute does not violate the rule of uniformity prescribing the same taxes upon the same class of subjects within the territorial limits of the authority levying the tax. The right of inheritance is not a natural right. The Legislature has the authority to prescribe the terms upon which collateral kindred may take the property of a decedent.

8. ———: ———: EXEMPTION. Nor is such act unconstitutional because it exempts from its burdens conveyances, legacies and devises to educational, charitable and religious purposes. It does not create a property tax, and if it did, the Constitution itself exempts a certain amount of the property of educational, charitable and religious institutions from taxation.

*Certiorari.*

MOTION TO QUASH DENIED.

*Silas B. Jones* and *Lyon & Swarts* for relators.

(1) Taxes are burdens or charges imposed by the legislative power of a State to raise money for public purposes, that is, for the support of the government and for all public needs. Cooley on Taxation (2 Ed.), p. 1; State ex rel. v. Switzler, 143 Mo. 287; Glasgow v. Rowse, 43 Mo. 479; Railroad v. Maguire, 49 Mo. 500; Sheehan v. Good Samaritan Hospital, 50 Mo. 158; Deal v. Mississippi Co., 107 Mo. 470. A succession tax, or the price imposed by the State for the privilege of taking an estate by will or inheritance, is referable only to the taxing power of the State. It is an excise or duty laid by the State upon the right of a person to receive property by devise or inheritance from another under the regulation of the State. It can be lawfully exacted for public purposes only, that is to defray the necessary expenses in administering the government. State ex rel. v. Switzler, 143 Mo. 315, 327, 328; Medicine Co. v. Ziegenhein, 145 Mo. 368; Glasgow v. Rowse, 43 Mo. 489. Revenue is the annual yield of taxes, excise, customs, duties,

rents, etc., which a nation, state or municipality collects and receives into the treasury for public use. Webster's International Dictionary, p. 1233; Century Dictionary; 2 Bouvier's Law Dictionary, p. 920; Black's Law Dictionary, p. 1040; Anderson's Law Dictionary, p. 889. The maxims on the subject of taxation assume that taxes are laid for the purpose of obtaining a revenue. Cooley on Taxation (2 Ed.), p. 11; 1 Desty, Taxation, sec. 1, pp. 1 and 2. The word "revenue," as applied to the income of a government, does not mean simply funds raised by taxation, but includes all public moneys which the state collects and receives, from whatever source and in whatever manner. State v. Ewing, 22 Kan. 712. When money is once raised by taxation it is revenue. Railroad v. Maguire, 49 Mo. 503; Glasgow v. Rowse, 43 Mo. 490. The Constitution enjoins a uniform rule as to the imposition of taxes on all property, but does not abridge the power of the Legislature to provide for a revenue from other sources. Glasgow v. Rowse, 43 Mo. 491; Ex. Co. v. St. Joseph, 66 Mo. 680. Taxation is divided into two general classes: (a) that which is laid to raise a revenue for the State or for some political subdivision thereof, and (b) that which is assessed for benefits arising from local improvements. Lockwood v. St. Louis, 24 Mo. 20; Newby v. Platte Co., 25 Mo. 271; Garrett v. St. Louis, 25 Mo. 509; Shechan v. Hospital, 50 Mo. 158; Neenan v. Smith, 50 Mo. 529; St. Louis v. Clemens, 52 Mo. 143; Farrar v. St. Louis, 80 Mo. 387; Independence v. Gates, 110 Mo. 381; St. Joseph v. Owen, 110 Mo. 455; City of Clinton v. Henry Co., 115 Mo. 564. From the foregoing it follows that all money derived by the State from the exercise of the taxing power for public purposes is accurately denominated the revenue of the State. Constitutional provisions, which prescribe the forms of laws or other methods of levying taxes, and the objects to which the revenue raised thereby shall be applied, are mandatory and self-executing; and all legislative

enactments, as well as other procedures on the subject, which fail to comply therewith are void.    Cooley Taxation (2 Ed.), p. 327; People v. Kings County, 52 N. Y. 566; Dean v. Lufkin, 54 Texas 272; Bank v. Barber, 24 Kan. 534; Graham v. Horton, 6 Kan. 354; Morton v. Comptroller, 4 S. C. 458; State v. Johnson, 28 La. Ann. 511; Lynn v. Polk, 8 Lea (Tenn.) 131; Railroad v. Thornton, 152 Mo. 575; State v. Payne, 151 Mo. 663; Andrew Co. v. Schell, 135 Mo. 31.    (2) A statute which is in conflict with the evident purpose and intent of the Constitution is void.    Railroad v. Thornton, 152 Mo. 574; State ex rel. v. Payne, 151 Mo. 672; Andrew Co. v. Schell, 135 Mo. 38, 41; Book v. Earl, 87 Mo. 252. The Constitution, like an enactment of the Legislature, must be construed according to its plain intent.    State v. Holladay, 66 Mo. 388; State ex rel. v. Macon Co., 41 Mo. 458; Ex parte Marmaduke, 91 Mo. 254; State ex rel. v. Holladay, 64 Mo. 527; Cooley, Constitutional Limitations (6 Ed.), p. 69.    In construing the Constitution, the true intention of the framers must be arrived at if possible, and when necessary the strict letter of the instrument must yield to the manifest intent. State ex rel. v. Emmerson, 39 Mo. 89; Fusz v. Spaunhorst, 67 Mo. 266; State ex rel. v. King, 44 Mo. 285.    In construing the Constitution the whole instrument is to be examined with a view to arriving at the true intention of each part.    Cooley, Const. Limitations (6 Ed.), p. 72; State ex rel. v. Holladay, 64 Mo. 526; Riddick v. Walsh, 15 Mo. 536.    A thing which is in the intention of the makers of a statute is as much within the statute as if it were within the letter.    Coonce v. Munday, 3 Mo. 375; Riddick v. Walsh, 15 Mo. 535; Bryant v. Russell, 127 Mo. 430.    To appropriate public money is to set it apart for, or to assign it to, a particular person or use, in exclusion of all others.    Webster's International Dictionary, p. 74. The provisions of the Constitution in regard to appropriations of the revenue, and limiting the life of every appropriation act to

two years after its passage, are self-executing. State ex rel. v. Holladay, 64 Mo. 526; Fusz v. Spaunhorst, 67 Mo. 268. "Regular appropriations made by law," are those only which are made at the regular sessions of the General Assembly occurring biennially. State ex rel. v. Holladay, 64 Mo. 526; State ex rel. v. Seibert, 123 Mo. 434, 435, by SHERWOOD and BURGESS, JJ. (3) The general rule that the expression of one thing is the exclusion of another, applies to the construction of Constitutions as well as of statutes. Every positive direction of the Constitution contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of the provision. Constitutional inhibitions need not always be express; they are equally effective and not the less to be regarded when they arise by implication. When the Constitution defines the circumstances under which a right may be exercised, the specification is an implied prohibition against legislative interference to add to the condition. State ex rel. v. Seibert, 123 Mo. 434, by SHERWOOD and BURGESS, JJ.; State ex rel. v. Macon Co., 41 Mo. 458; People v. Draper, 15 N. Y. 544; Page v. Allen, 58 Pa. St. 345; Commonwealth v. Williams, 79 Ky. 46; State v. Johnson, 26 Ark. 286; Railroad v. Railroad, 130 U. S. 25; Cooley, Const. Lim. (6 Ed.), pp. 78, 79, 93, 94; State ex rel. v. Withrow, 133 Mo. 513; State ex rel. v. Woodson, 128 Mo. 514; State v. Laughlin, 73 Mo. 447; Ex parte Snyder, 64 Mo. 61; Maguire v. State S. Ass'n, 62 Mo. 346. (4) If an act of the General Assembly is a whole and indivisible scheme, and its purpose is to accomplish a single object only, if the object designed to be attained is unconstitutional, the whole act is void. If the provisions of a statute are so mutually connected together as to warrant the belief that the Legislature intended them as a whole, and that if all could not be carried into effect the Legislature would not have passed the residue independently, then, if some parts of the act are unconstitutional, the whole is void. Cooley, Const.

Lim. (6 Ed.), pp. 211, 212; State ex rel. v. Stephens, 146 Mo. 684; State v. Newell, 140 Mo. 287; State v. Bockstruck, 136 Mo. 353; State ex rel. v. Field, 119 Mo. 612; Railroad v. Brick Co., 85 Mo. 334; State v. Kring, 74 Mo. 624.

*Daniel Dillon,* also for relators.

(1) The Constitution provides that all revenue collected and money received by the State from any source whatsoever shall go into the Treasury. This is the first step. Having gotten the moneys of the State into the State Treasury, it expressly prohibits the General Assembly from diverting the same or permitting them to be drawn from the Treasury except in pursuance of regular appropriations made by law. It then specifically points out the order in which and the purposes for which the successive General Assemblies shall make appropriations. Then, so that there could be no room for doubt or cavil, it is expressly provided that no General Assembly shall have power to make any appropriation of money for any purpose whatever until the respective sums necessary for the purposes specified have been set apart and appropriated, or to give priority to a succeeding over a preceding item as above enumerated. See sec. 43, art. 4, Constitution. And section 19 of article 10 of the Constitution provides again that no money shall be paid out of the Treasury of the State except in pursuance of an appropriation by law; nor unless such payment be made, or a warrant shall have issued therefor, within two years after the passage of such appropriation act. And section 20 of article 4 provides that the General Assembly shall meet in regular session once only in every two years. These provisions clearly manifest the purpose of the framers of our Constitution in reference to the disbursement of the revenue of the State. In very plain and simple language they say that all revenue and moneys received by the State shall go into the State Treasury

and that no General Assembly shall have power to divert same or permit it to be drawn out except in pursuance of regular appropriations made by law, and that all appropriations by the successive General Assemblies shall be made in the following order. Then follows seven distinct purposes specifically named and placed in a certain specific order. And, after mentioning the seventh purpose, viz., the pay of the General Assembly, this language is used: "And such other purposes, not herein prohibited, as it may deem necessary." These provisions make it perfectly apparent that the Constitutional Convention intended that the revenues of the State should be paid into the State Treasury free from any trusts or pledges or liens or limitations, so that the General Assembly could freely appropriate them in accordance with the provisions of the Constitution. If the money, before being paid into the State Treasury, was already pledged or appropriated to a certain purpose, it would be impossible for the General Assembly to appropriate it as directed by the Constitution. The fundamental idea of the Constitution is that the money shall come into the Treasury unpledged and unappropriated. Then the next leading idea is that out of these moneys in the Treasury certain purposes or objects shall first be provided for in a certain order. And the next idea in this connection is that after having first made provision for the purposes or objects specifically preferred, each successive General Assembly shall be at full liberty to dispose of the balance of the money in the Treasury to such other purposes not prohibited by the Constitution as it may deem necessary, untrammeled and unrestricted by the action of any previous General Assembly. (2) The act of the General Assembly now before this court for consideration is clearly in conflict with both the letter and spirit of the provisions of the Constitution to which reference has been made. In the first place, by its very terms this act appropriates the moneys to be raised by the tax imposed to certain specific purposes, and directs that

it shall be deposited in the State Treasury for these purposes. It deprives all succeeding General Assemblies of the right to appropriate these moneys except for the purposes specified in the act. This is in direct conflict with the intent of the Constitution. In the second place, this act appropriates these moneys for the maintenance and support of the State University, and for public educational purposes, regardless of whether or not any of the objects preferred by the Constitution have been provided for. In other words, while the Constitution says that the revenues and moneys of the State shall be appropriated, first, for the payment of interest on the bonded debt of the State, and then for six other purposes in their order, and while the Constitution in specific language prohibits the General Assembly from making any appropriation of any money for any purpose until the respective sums necessary for the seven purposes mentioned in the Constitution have been set apart and appropriated, yet this act, so far as concerns the revenue that shall be raised by this collateral inheritance tax, gives a preference and priority to the State University and public educational purposes over any and all other objects and purposes. In the third place, this act attempts to appropriate the revenue to be derived from this tax, not only for two years, but for all time. State ex rel. v. Holladay, 64 Mo. 526.

*C. W. Wilson, Amicus Curiae.*

The Act of April 19, 1899, is void because in violation of sections 3, 4, 6, 7 and 8 of article 10 of the Constitution of Missouri in the following particulars: (a) Because it lacks uniformity. It does not tax the devolution of all property alike. It does not tax alike all bearing the same degree of relationship to the testator or intestate. Const., art. 10, sec. 3; State ex rel. v. Switzler, 143 Mo. 332; Curry v. Spencer, 61 N. H. 631; St. Louis v. Spiegel, 75 Mo. 145; s. c., 90 Mo.

587.    (b) It exempts from taxation property given to educational, religious or charitable purposes, contrary to the provisions of the Constitution.    Constitution, art 10, secs. 6 and 7; City of Kansas v. College, 111 Mo. 141.    (c) As the law imposes a tax for State purposes on property, it is void because the rate imposed is largely in excess of the rate authorized by the Constitution.    Constitution, art. 10, sec. 8; Crow v. State. 14 Mo. 312 to 319; Farrar v. City, 80 Mo. 387; Brookfield v. Tooey, 141 Mo. 619; State ex rel. v. Tracy, 94 Mo. 224; Arnold v. Hawkins, 95 Mo. 569; State ex rel. v. Railroad, 123 Mo. 78.

*W. M. Williams* for respondent.

(1) Section 43 of article 4, of the Constitution does not declare that all moneys received by the State from any source shall go into one common fund in the State Treasury, and that the General Assembly shall have no power to direct that any part of such money be credited upon the books of the Treasury to any special fund therein.    If such had been the purpose of the section, it would doubtless have been so expressed in terms. A statute will not be declared invalid because of an alleged "violation of the spirit of the Constitution," in the absence of some direct conflict with the express provisions thereof.    State ex inf. v. Kramer, 150 Mo. 100; Hamilton v. St. Louis Co., 15 Mo. 23; State ex rel. v. Laughlin, 75 Mo. 147; State ex rel. v. Mason, 153 Mo. 49; Cooley on Taxation (2 Ed.), p. 695.    (2) The Constitution manifestly does not prohibit the payment of money into the State Treasury to the credit of "a special fund" and clearly does not require all the State's money to be kept in "one general fund."    The Constitution itself creates a "State Interest Fund" and a "Sinking Fund," also a "Public School Fund," and commands that they be kept separate from other moneys

belonging to the State. It further provides "a fund" to meet "emergency bonds," when issued. It also directs that all moneys in the State Treasury, belonging to the State, shall be deposited by the Treasurer to the credit of the State "for the benefit of the funds to which they respectively belong," in such bank as may be selected in the manner provided therein. Section 43 of article 4, can not mean that all moneys received by the State and all revenues collected by it shall go into "one fund," because other parts of the Constitution imperatively require that certain portions of such revenue shall be credited to a special fund. (3) The Act of April 19, 1899, levying a tax upon collateral inheritances, does not interfere in any manner with the sources from which the "Revenue Fund" is supplied. The statutes providing money for this fund are still in full force and effect. No attempt has been made to so subdivide the revenue of the State that appropriations can not be made in the constitutional order without disregarding such subdivision of the State's money. (4) No lien is created by the Constitution upon the revenue and money of the State, in favor of one of the items for which the General Assembly is required to make appropriation by section 43 of article 4 of the Constitution, to the exclusion of others subsequently enumerated in said section. The Constitution does not require that the first money that goes into the Treasury shall be applied to the first item for which an appropriation must be made. No priority of payment is given by said section to one appropriation over another. It was not intended that the items mentioned last in the order of making appropriations should not be paid until after enough money had been accumulated in the Treasury to pay all the preceding items. The Constitution simply provides the order in which the General Assembly shall pass the appropriation bills. (5) The Act of 1899, creating a tax upon collateral inheritances, and requiring the money

arising therefrom to go into the State Treasury, a part to the credit of the fund known as the "State Seminary Moneys" "for the maintenance, support and better equipment" of the State University, and another part to the credit of the "Educational Fund," does not "make an appropriation of money" within the meaning of section 43 of article 4, and section 19 of article 10, of the Constitution. Not one dollar of these funds can be paid from the State Treasury under this statute. It exprsssly requires that "all said moneys shall be disbursed in pursuance of regular appropriations of the General Assembly." The creation of a fund in the Treasury for a particular use, without authority to the executive officers to disburse said money and apply the same to the object for which it is collected, is not such an "appropriation" as is referred to in said sections of the Constitution. Sec. 8 of schedule, and sec. 14, art. 10, of Constitution; Proll v. Dunn, .22 Pac. Rep. 145; State v. Moore. 69 N. W. 376; Shattuck v. Kincaid, 49 Pac. Rep. 760; Pickel v. Finley, 44 S. W. 480; Journal Co. v. Kinney, 24 Pac. Rep. 96. (6) The tax, excise or duty levied in this case is confessedly for a public purpose and upon a right or privilege which the State has the power to tax. No objection is made to the method of the assessment or to the process by which it is to be collected. The objection of the relators goes to the point, only, that the money, after it gets into the possession of the State, is to be credited to a special fund, instead of to the "General Revenue Fund." (7) It is true that one General Assembly can not tie the hands of its successors, and although money may be credited in the Treasury to a special fund, yet it belongs to the State, and, in the absence of constitutional restriction's, is subject to the will of future Legislatures. Connor v. Bent, 1 Mo. 237; State ex rel. v. St. Louis Co. Ct., 34 Mo. 572. (8) The statute is also attacked, not by relators, but in behalf of others interested in the question, on the ground that the tax is not uniform and that improper exemptions are made;

that it is a property tax and exceeds the constitutional limit. (a) "The tax is not a tax upon the property itself but upon its transmission by will or descent." United States v. Perkins, 163 U. S. 625; State ex rel. v. Switzler, 143 Mo. 327; Dos Pasos on Inheritance Tax Laws (2 Ed.), sec. 41. (b) "The constitutional requirement of uniformity is satisfied by a tax on the transmission of property by will or descent to strangers and collaterals when it is uniform as to the entire class affected, although other classes of persons are exempted from the tax." The classification made by this act is a natural and not an artificial one. State ex rel. v. Switzler, 143 Mo. 333; State v. Hamlin, 25 L. R. A. 632; Minott v. Winthrop, 38 N. E. 512; Dos Pasos on Inheritance Tax Laws, sec. 18.

GANTT, J.—On July 11, 1900, the probate court of the city of St. Louis, of which Hon. William W. Henderson is the sole judge, in the course of the administration of the estate of Anna Puff, deceased, assessed a collateral inheritance tax of $200 upon a legacy of $4,000, bequeathed by the will of said Anna Puff to Sophia Puff, one of the relators herein.

The assessment of said tax was made strictly in accordance with the Act of the General Assembly of Missouri, approved April 19, 1899.

The legatee and the executor voluntarily appeared in the probate court at the time of said assessment and objected thereto on the ground that the said act was unconstitutional and the court was without jurisdiction in the premises, which objections were overruled. On the next day said relators moved the court to set aside its said order and assessment on the ground that said act was in conflict with section 43, article 4, of the Constitution of this State, and section 19 of article 10, and section 5 of article 11, of the Constitution.

The said legatee was a collateral relative of the testatrix and if the tax is constitutional this legacy falls within the act.

The validity of the statute is the one matter for determination here, the record having been removed into this court upon a writ of certiorari issued out of this court.

In this court, relators move to quash the said record of assessment.

The act in question was passed by the General Assembly and is contained in the Laws of 1899, page 328, and has been incorporated into the first volume of the Revised Statutes of Missouri, 1899, at page 186 and pages following. So much of said act as is pertinent for our decision is as follows:

"Section 1. All property which shall pass by will, or by the intestate law of this State, from any person who may die seized or possessed of the same while a resident of this State, or, if decedent was not a resident of this State at the time of death, which property or any part thereof shall be within this State, or any interest therein or income therefrom, which shall be transferred by deed, grant, bargain, sale or gift, made or intended to take effect in possession or enjoyment after the death of the grantor, bargainor, vendor or donor, to any person or persons, or to any body politic or corporate, either directly or in trust or otherwise, or by reason whereof any person or body politic or corporate shall become beneficially entitled in possession or expectancy, to any property or the income thereof, other than to or for the use of the father, mother, husband, wife, legally adopted children, or direct lineal descendant of the testator, intestate, grantor, bargainor, vendor or donor, except property conveyed for some educational, charitable or religious purpose exclusively, shall be and is subject to the payment of a collateral inheritance tax of five dollars for each and every one hundred dollars of the clear market value of such property, and at and after the same rate for every less amount, to be paid to the collector of revenue of the proper county, and for the purposes of this act the city of St. Louis shall be affected through its corresponding officers as if it were a county, for the use of

the State as hereinafter provided; and for the enforcement and collection of such tax there is hereby created against the property affected thereby a first lien in favor of the State of Missouri, upon which a civil action may be prosecuted in any court having proper jurisdiction; and all heirs, next of kin, legatees and devisees, administrators, executors and trustees, grantees, vendees and donees shall be liable for any and all such taxes until the same shall have been paid as hereinafter directed: Provided, that all collateral inheritance taxes shall be sued for within five years after they are due and legally demandable, otherwise they shall cease to be a lien as against any purchasers of the property: Provided, further, that the word 'property,' as used in this section, shall be taken to mean the property or interest therein passing or transferred to individual legatees, devisees, heirs, next of kin, grantees, vendees or donees, and not as the property or interest therein of the testator, intestate, grantor, bargainor, vendor or donor. . . . . . .

"Sec. 3.    The collector of each county shall, on or before the fifteenth day of each month, pay to the State Treasurer all taxes, collected or received by him, under the provisions of this act, before the first day of said month, deducting therefrom his commissions, as provided in section twenty-two of this act, and all lawful disbursements made by him, in accordance with the provisions of this act, upon the certificate of the probate judge of his county of which collection and payment he shall make a report under oath to the State Auditor, on or before the fifth day of each month, stating for what estate paid, and in such form and containing such particulars as the State Auditor may prescribe; and for any failure to make such monthly payments he shall be subject to the penalty prescribed by section seven thousand six hundred and thirty-six (7636) of the Revised Statutes of 1889.

"Sec. 4.    The moneys received by the State Treasurer under the provisions of this act shall be deposited in the State

Treasury to the credit of the fund now existing in the State Treasury and known as the "State Seminary Moneys," for the maintenance, support, and better equipment of the buildings, apparatus, books, instruction, etc., of the University of the State of Missouri, to an amount not exceeding in any one year the equivalent of one-tenth of one mill upon every dollar of the assessed valuation of taxable property of this State for the said year: Provided, that one-eighth of all such moneys so received shall be devoted to the use of the School of Mines and Metallurgy, a department of the said University: Provided further, that if the net amount deposited in any one year by the State Treasurer under the provisions of this act, to the credit of the "State Seminary Moneys" be not equivalent to one-tenth of one mill upon every dollar of the assessed valuation of taxable property of this State for the said year, it shall be the duty of the State Treasurer to make good this deficiency out of the first moneys received under the provisions of this act in the next succeeding year: Provided further, that all said moneys shall be disbursed in pursuance of regular appropriations of the General Assembly, in accordance with the provisions of section five thousand six hundred and ninety-one (5691) of the Revised Statutes of 1889.

"Sec. 5. The moneys received by the State Treasurer under the provisions of this act which shall exceed in any one year the amount required by section four of this act to be deposited to the credit of the "State Seminary Moneys," shall be deposited in the State Treasury to the credit of a fund to be known as the "Educational Funds," which is hereby created and established. The moneys deposited in the said fund shall be appropriated by the General Assembly for public educational purposes."

For convenience we insert those provisions of the Constitution which relators urge have been violated by the act.

Section 43, of article 4, is as follows:

"Sec. 43.   *Appropriations, Order of.*—All revenue collected and moneys received by the State from any source whatsoever shall go into the Treasury, and the General Assembly shall have no power to divert the same, or to permit money to be drawn from the Treasury, except in pursuance of regular appropriations made by law.   All appropriations of money by the successive General Assemblies shall be made in the following order:

"First, for the payment of all interest upon the bonded debt of the State that may become due during the term for which each General Assembly is elected.

"Second, for the benefit of the sinking fund, which shall not be less annually than two hundred and fifty thousand dollars.

"Third, for free public school purposes.

"Fourth, for the payment of the cost of assessing and collecting the revenue.

"Fifth, for the payment of the civil list.

"Sixth, for the support of the eleemosynary institutions of the State.

"Seventh, for the pay of the General Assembly, and such other purpose not herein prohibited as it may deem necessary; but no General Assembly shall have power to make any appropriation for money for any purpose whatsoever, until the respective sums necessary for the purpose in this section specified have been set apart and appropriated, or to give priority in its action to a succeeding over a preceding item as above enumerated."

Section 19, article 10, of the Constitution, is as follows:

"Sec. 19.   *Money to be Paid as Appropriated—Limit—How Continued—Receipts and Expenditures.*—No moneys shall ever be paid out of the treasury of this State, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made, or a war-

rant shall have issued therefor, within two years after the passage of such appropriation act; and every such law, making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such sum or object. A regular statement and account of the receipts and expenditures of all public money shall be published from time to time."

Section 5, article 11, of the Constitution, is as follows:

"Sec. 5. *State University.*—The General Assembly shall, whenever the Public School Fund will permit and the actual necessity of the same may require, aid and maintain the State University, now established, with its present departments."

Section 6 of article 11, which should also be considered in connection with this controversy, is in these words:

"Sec. 6. *Public School Fund, From Whence Derived, Not to be Diverted.*—The proceeds of all lands that have been or hereafter may be granted by the United States to this State, and not otherwise appropriated by this State or the United States; also, all moneys, stocks, bonds, lands and other property now belonging to any State fund for purposes of education; also, the net proceeds of all sales of lands and other property and effects that may acrue to the State by escheat, from unclaimed dividends and distributive shares of the estates of deceased persons; also, any proceeds of the sales of the public lands which may have been or hereafter may be paid over to this State (if Congress will consent to such appropriation); also, all other grants, gifts or devises that have been or hereafter may be, made to this State, and not otherwise appropriated by the State or the terms of the grant, gift or devise, shall be paid into the State Treasury, and securely invested and sacredly preserved as a Public School Fund; the annual income of which fund, together with so much of the ordinary

revenue of the State as may be by law set apart for that purpose, shall be faithfully appropriated for establishing and maintaining the free public schools and the State University in this article provided for, and for no other uses or purposes whatsoever."

A brief, making additional objections to said tax, has also been filed in this case in behalf of the heirs of Mary A. Watson, deceased, whose estate is in process of administration in St. Charles county. It is contended in said brief that the statute under consideration violates the rules laid down in sections 3, 4, 6, 7 and 8 of article 10, which require taxes to be collected for public purposes only, and to be uniform upon the same class of subjects within the territorial limits of the authority levying the tax; and declare that all property subject to taxation shall be taxed in proportion to its value, and prohibit all except certain specified exemptions set out in section 6, and provide that the rate of taxation shall not exceed fifteen cents on the hundred dollars whenever the assessed valuation of the property of the State shall amount to nine hundred million dollars.

I.    The granting of a writ of certiorari by this court is discretionary. If the statute which is challenged in this proceeding as unconstitutional, is valid, the question ought to be finally and speedily settled. It is a matter of prime importance that a rule of such general application should not remain in doubt. The public welfare affords a pressing reason why we should determine the validity of the tax provided by the act.

The first contention of the relators is that the Act of April 19th, 1899, is unconstitutional, because it appropriates the State's revenues in an inverse order to that laid down in section 43, article 4, of the Constitution, and destroys the priorities provided in that section.

As said by the learned counsel who maintains this propo-

sition, a somewhat brief consideration ought to demonstrate its truth or its unsoundness.

The constitutional provision is simple, and the statute is unobscure. The argument of relator is predicated on section 43 of article 4 of the Constitution, namely, that, "all revenue collected and moneys received by the State from any source whatsoever shall go into the Treasury, and the General Assembly shall have no power to divert the same or permit the money to be drawn from the Treasury except in pursuance of regular appropriations made by law," which is followed by the provision directing the order in which the Legislature shall pass appropriation bills.

From these words counsel deduce the proposition "that all revenue collected and moneys received by the State from every source shall go in the *first* instance into one *common* or *general fund,* unfettered, unpledged and unappropriated," and that these words necessarily prohibit the creation of any special funds in the Treasury to be supplied out of revenue provided by the General Assembly.

Other words must be read into the article to justify such an interpretation, to-wit, "one general fund." If such was the intention of the framers of the Constitution they were singularly unhappy in expressing themselves, an imputation which we are unwilling to cast upon that body, especially when they were preparing an instrument so solemn and important in its nature.

Learned counsel reach their conclusion that the convention intended that all revenue and moneys collected should go into "one general" or "common fund" by a process of reasoning and not from any express command of the Constitution. If they are right, then *all* the revenues must go into one common or general fund and yet the Constitution itself provides elsewhere for *special funds.* Thus, section 14 of article 10 directs that an annual tax shall be levied and collected to pay the inter-

Vol 160 mo—14

est on the bonded debt of the State, and to reduce the principal thereof not less than two hundred and fifty thousand dollars each year. This money, we all agree, must and does "go into the Treasury," but it goes into a special fund and is devoted to a special purpose.

In unequivocal terms it is required to be paid into the Treasury, to be "appropriated and paid out for" "the payment of all interest upon the bonded debt that may become due during the term for which each General Assembly is elected," and second "for the benefit of the sinking fund," and for more than twenty-five years this tax has been paid into these special funds and religiously devoted to the purposes specified by the Constitution. Neither can it be said of the taxes that are thus set apart by the Constitution that they are unpledged and unfettered. This provision was intended to strengthen the State's credit and give assurance that its obligations would be met promptly and sacredly. That it had the desired effect, is now a part of the State's financial history.

Again, section 6 of article 11, set out in the statement, creates a "Public School Fund," which while "it goes into the Treasury" is set apart for a special purpose. If it shall be said that "the interest on the public debt" and "the sinking fund," are the first objects mentioned in the order of appropriations, and therefore the order is not disturbed by the creation of the special fund provided in section 14 of article 10, and "public schools" is the third in order, surely this can not be said of the "Public School Fund" which is a special fund, and does not follow in the order prescribed for appropriations.

Section 8 of article 10 provides for a "State Revenue Fund" out of which the general appropriations are made.

But again, section 15, article 10, leaves no doubt whatever as to the intention of the convention. It requires that "all moneys now or at any time hereafter, in the State Treasury, belonging to the State, shall immediately on receipt thereof be

deposited by the Treasurer to the credit of the State for the benefit of the funds to which they respectively belong in such bank or banks" as may be selected under that section.

So that it will not do to say that the Constitution requires all revenues of the State to be *first* paid into one general or common fund and then disbursed in the order named in section 43, article 4, of the Constitution.

That section simply requires the General Assembly to proceed in that order in passing its appropriation bills.

It does not follow because the Legislature is required to pursue a specific order in passing appropriation bills, that it may not provide a tax for a public purpose, and require it to be paid into the Treasury and set apart in a special fund subject to a subsequent appropriation for the purpose for which it was levied, or for that matter, to some other public purpose, when unrestrained by a constitutional limitation.

In prescribing the order for the passage of the appropriation bills there was no intention to create special liens upon the moneys in the Treasury or give any priority of payment to one appropriation over another.

We think the purpose of the framers of the Constitution among possibly others, was to prevent an adjournment of the Legislature without making the necessary appropriations for the support of the State Government, and its various educational, penal, and eleemosynary institutions, and the prompt payment of its obligations as they matured, and in this manner prevent extravagant and extraordinary appropriations in excess of the estimated and probable revenues of the State. We can not agree with the learned counsel that the entire income of the State is mortgaged in favor of the various items named in section 43, article 4, of the Constitution, and that the full amount of the appropriation for each purpose must first be collected and set apart before any part of the next in order can be paid. No such construction has ever been given the Constitution or

the laws appropriating taxes for various state and county purposes.

The Constitution does not say that the *first* money received into the Treasury shall be applied to meet the first item mentioned in said section 43, that no money shall be disbursed on account of a subsequent appropriation until a sufficient amount is accumulated in the Treasury to meet all prior appropriations.

Such a claim is inconsistent with our whole scheme of taxation. The moneys for the various institutions and the support of the civil list are never in the Treasury when the Legislature makes the appropriations. A large part of the funds will not reach the Treasury for nearly two years after the appropriations are made. If the contention of the relators should be sustained, the mileage and per diem of the members of the Legislature, and of the various State officials would be postponed until two years after their passage.

No such interpretation has ever been put upon this section, but the practical construction has been that no such lien or priority was created thereby.

Moreover, the Act of April 19, 1899, does not interfere with the "Revenue Fund" nor the sources from which it is and has been supplied.

The statutes passed in pursuance of section 8, article 10 of the Constitution, are public laws of which we are required to take notice, and they disclose no diminution of that fund by setting any portion of it aside for a special fund, and the fear expressed by counsel that the Legislature may cause all the revenues of the State to be placed in special funds so as to obstruct future legislatures in making appropriations as required by section 43, supra, is groundless. No such attempt has been made up to this time, and it will be time enough to consider whether such action by the General Assembly would invalidate the taxes or cause the courts to disregard the sub-

division into separate funds, when that question arises.   It is obviously not presented on this record, so that we are constrained to reject the premise upon which counsel have built a large part of their argument.

II.   The next most serious contention by the learned counsel is that the Act of April 19, 1899, is itself an appropriation of money within the meaning of section 43, article 4, and section 19 of article 10, of the Constitution.

Says the learned counsel:   "Every dollar raised thereby is by the very act which imposes the tax, instantly and perpetually appropriated to the maintenance of the University and to public educational purposes."   "The successive General Assemblies may not appropriate a single penny of it for any other purpose," etc.

To this we answer that the act providing for this tax not only does not appropriate said tax in and of itself, but expressly forbids its expenditure "save in pursuance of regular appropriations of the General Assembly in accordance with the provisions of section 5691 of Revised Statutes of 1889," thus on its face negativing the claim of relators.   The word "appropriate" is one the significance of which is largely affected by the context in which it is found.   Not a dollar of the funds raised under this act can be paid out of the Treasury without an express statute of the State disbursing it to such purposes as the Legislature may devote it to.   The act in question is not such an appropriation.   "Appropriation" and "fund" are not synonymous terms in the meaning of the Constitution.   Nothing is more familiar to us in this State than the making of appropriations out of special funds.   And such is the distinction by other courts:   Proll v. Dunn, 22 Pac. Rep. 145 ; State ex rel. v. Moore, 69 N. W. 373 ; Shattuck v. Kincaid, 49 Pac. Rep. 758 ; Pickle v. Finley, 44 S. W. 480.

In Ristine v. The State, 20 Ind. 328, the Supreme Court of Indiana held that the interest upon the public debt of the

State could not be paid without a specific appropriation by the
Legislature.    Judge Perkins pointed out that the duty of the
Legislature to make an appropriation is not an appropriation.
So without further elaboration we hold that the Act of April
19, 1899, was not an appropriation bill within the meaning of
section 43, article 4 of our Constitution, but on the contrary
was an act to provide a tax to create a special fund, which
could only be withdrawn from the Treasury by a subsequent
appropriation act duly enacted, and hence it in no way con-
flicts with the order of passing the appropriation bills which is
directed by the said section 43.    Neither is it a perpetual or
continuing appropriation which violates section 19 of article
10 of the Constitution, which forbids the payment of any
money out of the Treasury more than two years after the pass-
age of an act appropriating it, for the very simple reason that
it is not an appropriation act.

The tax provided by the Act of April 19, 1899, is con-
fessedly for a public purpose, and upon a right or privilege
which the State has the power to tax.    [State ex rel. v. Switz-
ler, 143 Mo. 319.]

The method of the assessment or the process by which it is
to be collected is not challenged by relators, but the great ob-
jection, as already seen, is to the fact that it creates a special
fund, in the Treasury, instead of placing it in the general or
common fund.    Let it be freely admitted that one General
Assembly can not tie the hands of its successor, and that al-
though this tax is set apart into a special fund, it still belongs
to the State and may be appropriated to another and different
use, this but confirms us in our view that this is not an appro-
priation or disbursement act, but is one creating a fund which
must be appropriated before it can be withdrawn from the
Treasury.    We have said sufficient to indicate that in our
opinion this act is not unconstitutional on the grounds assigned
by the relators.

III.   But other counsel were permitted to assail the act on two other grounds, namely, that it is not uniform and that improper exemptions are allowed by it, and that it is a property tax and exceeds the constitutional limit.

As to the first of these propositions, we consider it quite clear that this act does not impose a tax upon the property of the devisor, testator or grantor in addition to its burden in common with all other property, as was the case in the Acts of 1895 and 1897, but is levied only upon its transmission by will, descent, or grant.   It is a bonus or duty levied upon the right or privilege of the devisee, heir or distributee, of receiving his share.

As was said in State ex rel. v. Switzler, 143 Mo. 329: "It is a burden on each person claiming succession measured by the value of his interest (received from the testator or intestate) and collectible out of his interest only."

It is clearly distinguishable from a property tax.   Such a tax has been almost universally sustained, on the principle that it is an attribute of the State's power and sovereignty to regulate the manner and terms within which property, real and personal, within its dominion, may be transferred by last will and testament, or by inheritance, and of prescribing who shall not be capable of taking it.   [U. S. v. Perkins, 163 U. S. 625.]

Notwithstanding the able arguments to the contrary, we think this is a proper succession tax as distinguished from a strict property tax.   While referring to the property devised or inherited, it does so only to secure uniformity among the devisees, legatees or heirs receiving said property, the object being to tax each in proportion to his or her interest received and for that privilege.   [Eyre v. Jacob, 14 Gratt. 427.]   Does the act violate the rule as to uniformity prescribed by section 3, article 10, of the Constitution?   That provision applies alike to all taxes upon the same class of subjects within the territorial limits of the authority levying the tax.   A reading

of the statute will disclose that the same per cent is levied upon all the inheritances which are taxed, to-wit, collateral inheritances.

Is the selection of collateral kindred as a class for taxation and exempting the lineal descendants an unlawful or arbitrary classification?

In State ex rel. v. Switzler, 143 Mo. 287, we had occasion to discuss what is termed a progressive inheritance tax, and held that a statute which levied five per cent upon legacies of ten thousand dollars and seven and one-half per cent additional upon the excess of ten thousand dollars, was arbitrary classification under our Constitution; that uniformity could only be attained, where the amount of property alone was made the basis of the tax, by levying the same at one uniform per cent upon the property.

In that case we intimated, without deciding the point, that perhaps the Legislature might make a just distinction or classification "according to different degrees of kinship to the decedent or testator or grantor, and levy a different rate upon the different degrees."

This is now pressed upon us for decision. It is insisted that this act makes an unnatural and unconstitutional classification. It will be observed that it is laid upon collaterals only, and exempts the lineals both ascending and descending, and the husband and wife and adopted children.

The right of the Legislature to prescribe the right of descent and inheritance can not be doubted. It is not a natural right. [2 Blackstone's Com., pp. 10 and 13; Strode v. Commr., 52 Pa. 181; State v. Hamlin (Maine), 25 L. R. A. 632; Eyre v. Jacob, 14 Gratt. 430.]

The Legislature has seen fit to make this classification, and unless it is so arbitrary that we can say beyond a reasonable doubt that it transcends constitutional limitations, we are bound to accept it.

We are unable to put our finger upon the provision of the Constitution which it violates, and moreover it seems to us to be a natural and reasonable classification.    The classification being legal, the tax is uniform upon the entire class upon which it is levied, and this is all section 3 of article 10 of the Constitution requires.    [State v. Hamlin, supra.]

IV.    We are next and finally brought to the insistence of counsel that the statute is void because it exempts conveyances, legacies and devises to "educational, charitable or religious purposes exclusively."

It is argued that in so doing it violates sections 6 and 7 of article 10 of the Constitution of Missouri, which limits the amount of property which may be exempted from taxation and as this statute prescribes no limit to the amount of property which may be conveyed or devised to exclusively charitable purposes and held exempt from this succession tax, it is therefore void.    And if it shall be objected that the classification, by distinguishing charitable and religious corporations from private business corporations, is unconstitutional, we answer this is done by the Constitution itself.    [Sec. 21, art. 10.]

It is trite and familiar law that a statute may be constitutional and valid in part and invalid in part, and the valid portion enforced.    No charitable devise was made in this case, and hence the discussion of the question here raised will not affect the case before us, but we have had the full benefit of oral and printed arguments upon the point, and are prepared to say that in our opinion the position is not sound.

The contention, like others already discussed, is predicated upon the fact that this is a property tax, for it is evident that sections 6 and 7 of article 10 of the Constitution deals directly with property taxation and limits the amount of property which may be exempted from such taxation, but as we have already held this is not a property tax and as there is nothing in the act which exempts a larger amount of the prop-

erty conveyed or devised to religious or charitable purposes from its just proportion of all property taxes than is permitted by the Constitution, it necessarily follows that the said sections of the Constitution have no application to the statute under discussion.

In State ex rel. v. Switzler, 143 Mo. loc. cit. 333, we quoted with approval the decision of the Supreme Court of Maine in State v. Hamlin, 86 Maine 495; Ibid v. Ibid, 25 L. R. A. 632: "The constitutional requirement of uniformity is satisfied by a tax on the transmission of property by will or descent to strangers and collaterals when it is uniform as to the entire class affected, although other classes of persons are exempted from the tax." Citing also Railroad Tax cases, 13 Fed. Rep. 722.

We see no reason for departing from the views then adopted as our own. It results that none of the objections to the constitutionality of the Act of April 19, 1899, are in our opinion tenable and the motion to quash the record is denied. All concur.