Petition of the BOARD OF PUBLIC BUILDINGS of the State of Missouri, and John M. Dalton, Governor, Hilary A. Bush, Lieutenant Governor, and Thomas F. Eagleton, Attorney General, constituting the members of said Board.

The BOARD OF PUBLIC BUILDINGS of the State of Missouri, and John M. Dalton, Governor, Hilary A. Bush, Lieutenant Governor, and Thomas F. Eagleton, Attorney General, constituting the members of said Board (Petitioners), Respondents,

v.

Joseph M. CROWE and Kathryn K. Crowe (Intervenors), Appellants.

No. 49598.

Supreme Court of Missouri,

En Banc.

Dec. 11, 1962.

Motion for Rehearing Denied and Opinion Modified Jan. 14, 1963.

Rozier, Carson, Inglish, Nacy & Monaco, Jefferson City, for appellants.

Thomas F. Eagleton, Atty. Gen., J. Gordon Siddens, Asst. Atty. Gen., Robert B. Fizzell, Robert B. Fizzell, Jr., Norman E. Gaar, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, for respondents.

EAGER, Judge.

This matter arises from a petition filed under §§ 108.310–108.350 [1] by the Board of Public Buildings of the State of Missouri seeking a pro forma decree authorizing the issuance of, and adjudicating the validity of, a series of $5,000,000 of revenue bonds. Two taxpayers intervened and, by their pleadings, raised the issues which are here for determination. Various constitutional points are directly involved.

By §§ 8.010 and 8.370–8.450 (largely Laws 1959, HB 241, §§ 1–9, and as amended in certain respects in 1961 as to §§ 8.010, 8.390 and 8.420, Mo.Cum.Supp.1961, p. 22), the legislature has provided in substance: that the petitioner Board is constituted "a body corporate and politic"; that it may acquire sites, construct, equip and operate as a "project" a public building or buildings in any city of 10,000 or more inhabitants; that it "may require" any or all state agencies which occupy rented or leased quarters in such a city to occupy space therein and to contribute "from funds appropriated for its support" a proportion of the rentals necessary from the project in a proportion based upon the number of square feet occupied; that the Board may issue and sell revenue bonds to raise funds for the estimated cost of the project, pledge the net income and revenues from the project to the payment of such bonds, and covenant to "fix, maintain and collect the reasonable rates and charges for the use of the project" (§ 8.400) such as in the judgment of the Board will provide sufficient revenues to operate and maintain the project, and to provide and maintain specifically named funds for the payment of the bonds, for a reserve, and for depreciation; that such bonds shall not be deemed to be an "indebtedness" of the state or of the Board or of its individual members. Sundry more detailed provisions were enacted concerning the interest rate (not over 5%), maturities of bonds, the right to call the bonds, and the refunding thereof, if necessary. These provisions are not involved

here. It was provided, however (§ 8.440) that the holder or holders of any bond or bonds might, by proper civil action, compel the Board to perform all duties so imposed upon it, including the "making and collecting of sufficient rates and charges * * *" and also to enforce the performance" of its covenants made in issuing the bonds.

The Board, on December 14, 1961, unanimously adopted a detailed resolution finding that it was "necessary, advisable and suitable" to acquire a site and erect an office building in Kansas City for the use of the various state departments and agencies, operated there and now occupying rented quarters, and that the estimated cost was $5,000,000; and resolving: that revenue bonds should be issued and sold (setting forth specifically all the details and provisions thereof) to cover the cost; that all such bonds should contain a provision that: they were "payable as to both principal and interest and premium, if any, solely and only out of and are secured exclusively by pledge of the net income and revenues arising from the operation of said state office building after providing for the costs of operation and maintenance thereof"; that such bonds should not be deemed to constitute an indebtedness of the state or of the Board. The Board covenanted to build and maintain the building, authorized the setting up of a construction fund and four other special funds or accounts in the hands of the State Treasurer to be administered by action of the Board, and agreed to maintain the building as a revenue producing project, and to set up such a schedule of reasonable rates and charges as would produce income in an amount sufficient to pay operating costs and the principal and interest on the bonds. The Board also agreed that: " * * it will cause said building to be occupied by the agencies and instrumentalities of the State of Missouri, and by others if all of the space and facilities of the Project are not immediately required by said agencies and instrumentalities * * *." The resolution also contained provisions for declara-

---

[1]. All statutory references are to RSMo 1959 and V.A.M.S. unless otherwise designated.

-tion of default, the curing of defaults, and the enforcement of the rights of the bond-holders by suit against the Board to require it to perform its obligations or to account, ·or to enjoin unlawful acts. We have omitted many details in our discussion of this resolution, but they are unnecessary to a ·decision.

The intervenors, appellants here, very ·ably represented below and here, submit the following points: that the issuance of these bonds constitutes a liability of the state in ·contravention of § 37, Art. 3, Mo.Consti-tution 1945,[2] and that the statutes them-·selves are likewise unconstitutional; that, if the Board be considered a separate entity, then the issuance of such bonds would con-·stitute a lending of the State's credit in vi-·olation of §§ 38 and 39, Art. 3, Mo.Consti-tution; that the statutes in question consti-tute an unlawful delegation of legislative power in contravention of § 1, Art. 3 there-·of; that the proposal, as exemplified in the resolution, violates § 36, Art. 3, which re-·quires state funds to be deposited in the treasury; that it provides for the withdraw-al of state funds in a method contrary to § 28, Art. 4; and, that the designation of the State Treasurer as custodian, if these :are not state funds, imposes duties upon him not permissible under § 15, Art. 4. The trial court found and adjudged that neither the statutes, the resolution nor the issuance ·of the proposed bonds were violative of the ·Constitution and that all were valid.

We note at the outset that there is no Missouri case which is of any direct assist-·ance. Art. 3, § 37 of our Constitution pro-vides, in applicable part, as follows: "The ·general assembly shall have no power to ·contract or authorize the contracting of ·any liability of the state, or to issue bonds therefor, except * * *." (Here follow three exceptions with which we are not di-rectly concerned.) The corresponding pro-vision in our 1875 Constitution, § 44, Art. 4, was: "The General Assembly shall have no

power to contract or to authorize the con-tracting of any debt or liability on behalf of the State, or to issue bonds or other evi-dences of indebtedness thereof, except in the following cases: * * *." Strangely, the debates in the 1875 Convention seem to shed no light upon the views of the dele-gates with reference to the applicable part of this section, although there was much discussion of the exceptions. (Debates Mo. Constitutional Convention 1875, Vol. VII, pp. 326 et seq.) In our 1944 Convention the Committee on Phraseology changed the former wording; essentially, the change merely eliminated the words "debt or" and left "liability." A point, and probably the principal point, now made by appellants here is that our Constitution prohibits "lia-bilities" and not merely "debts" or "indebt-edness," as do many other constitutions. They more or less concede that these reve-nue bonds would not constitute a state debt, which, they say, is "that which one is bound to pay to another or * * * a sum of mon-ey due from one person to another * * *." But they say that "liability" means "the state of one who is bound in law and justice to do something which may be enforced by ac-tion," citing, Fidelity Coal Co. v. Diamond, 310 Ill.App. 387, 34 N.E.2d 123; Hyatt v. Anderson's Trustee, 25 Ky. 132, 74 S.W. 1094, 1096; Behnke v. New Jersey High-way Authority, 13 N.J. 14, 97 A.2d 647, 654; 25 Words and Phrases "Liability" p. 62, et seq. Literally dozens of definitions may be found of the word "liability." So far as the definitions are concerned, those interested may examine Black's Law Dictionary, 4th Edition, citing multiple authorities, each with its own definition, and also the many corresponding definitions of the word "lia-ble." Generally, the word "liability" com-prehends more than does the word "debt"; but any ensuing confusion arises, at least in large part, from a failure to consider the context and the precise type of "liability" under consideration. A common conception of the word is that it denotes present or fu·

---

2. All references to the Missouri Constitution are to the present 1945 Constitution except where otherwise stated.

ture debt, fixed or contingent. (See the various definitions in Black, supra.) As stated in Erickson v. Grande Ronde Lumber Co., 162 Or. 556, 92 P.2d 170, loc. cit. 174, 94 P.2d 139: "The words 'liabilities' and 'indebtedness' would be deemed by Dean Goodrich as accordion words: they are capable of expanding and contracting in their connotations. They may mean present, current, future, fixed or contingent debts. Their meaning in each instance must be determined, not by looking in the dictionaries, but by reading the context, reviewing the transaction, and taking note of the subsequent conduct of the parties who used the equivocal words." We note here that the prohibited "liabilities" are those which the legislature might contract, or authorize the contracting of, and that the issuance of "bonds therefor" is directly and immediately considered in the context; we also note that the exceptions which follow contemplate the assumption of contractual debts, presumably to be paid by general taxation, for the legislature is authorized to issue bonds and to provide for "an annual tax on all taxable property" sufficient to pay off any bonds issued under the section.

There was no such restriction upon the contracting of debts or "liability" prior to the adoption of the 1875 Constitution. See, generally, St. Louis Southwestern Railway Co. v. Loeb, Banc, Mo., 318 S.W.2d 246, 252, where it was said: "The state had invested heavily in railroad bonds (prohibited after 1865) and had lost millions in the liquidation of these, ending in 1868; cities, towns and counties still owned large amounts of railroad common stock in 1871." Some of the railroads for which money was thus furnished were, in fact, never built. The principal restriction in the 1865 Constitution consisted (Art. 11, Sec. 13) of a declaration that the credit of the State should not be given or loaned in aid of any person " * * nor shall the state hereafter become a stockholder in any corporation or association, except for the purpose of securing loans heretofore extended to certain railroad corporations by the state." Such misfortunes un-

doubtedly furnished the background for the general restriction of legislative powers beginning in 1875. But, generally speaking, the people were thus prohibiting the legislature from incurring obligations which would or might require general taxation to liquidate.

Cases from various states are cited, pro and con, involving somewhat similar situations. It will be impossible to discuss these in any detail. Most of them involved questions as to whether or not projects and enactments somewhat similar to ours infringed upon constitutional prohibitions against "indebtedness" or "debt" of the state. Some of the courts have proceeded upon the theory that the public body or agency created was a separate entity and that in any event its debt (if such there was) was not a debt of the state. Book v. State Office Building Commission, 238 Ind. 120, 149 N.E.2d 273; State ex rel. Fatzer, Atty. Gen., v. Kansas Armory Board, 174 Kan. 369, 256 P.2d 143; In re Opinion of the Justices, 252 Ala. 465, 41 So.2d 761; McArthur v. Smallwood, 225 Ark. 328, 281 S.W.2d 428; Holmes v. Cheney, 352 S.W.2d 943 (Arkansas); Geboski v. Montana Armory Board, 110 Mont. 487, 103 P.2d 679; State ex rel. Thomson, Atty. Gen., v. Giessel, 271 Wis. 15, 72 N.W.2d 577. Some of those cases and others, such as Preston v. Clements, 313 Ky. 479, 232 S.W. 2d 85; Application of the Oklahoma Capitol Improvement Authority, 355 P.2d 1028 (Okl.); State ex rel. Fatzer, Atty. Gen., v. Board of Regents of State of Kansas, 167 Kan. 587, 207 P.2d 373; Loomis v. Keehn, 400 Ill. 337, 80 N.E.2d 368; Kelley v. Earle, 325 Pa. 337, 190 A. 140, and Texas National Guard Armory Board v. McCraw, Atty. Gen., 132 Tex. 613, 126 S.W.2d 627, also hold that such revenue bonds do not constitute a debt within the meanings of the respective constitutional provisions. Missouri has so held with reference to municipal corporations and their constitutional debt limitations. (Sec. 26, Art. 6.) Dodds v. Kansas City, Banc, 347 Mo. 1193, 152 S.W.2d 128; City of Maryville v. Cushman, 363 Mo. 87, 249 S.W.2d 347.

Other cases have denied the validity of such legislative acts, generally holding them unconstitutional as in violation of debt limitations. Ayer v. Commissioner of Administration, 340 Mass. 586, 165 N.E.2d 885; State Office Building Commission v. Trujillo, 46 N.M. 29, 120 P.2d 434; State ex rel. Public Institutional Building Authority v. Griffith, 135 Ohio St. 604, 22 N.E.2d 200; Opinion of the Justices, 146 Me. 183, 79 A. 2d 753; Washington State Building Financing Authority v. Yelle, 47 Wash.2d 705, 289 P.2d 355. In most of these, however, certain material facts were essentially different from those in our case. Thus, in the Opinion of the Justices (Maine) supra, the Office Building Authority had power to mortgage the real estate, it could only lease the building *directly to the State,* and the State obligated itself to pay all the rentals for a lease period of up to thirty years and until the bonds should be retired. The arrangement there was held, in fact, to constitute a mere instalment purchase. In the Yelle case, the statute purported to bind future legislatures to appropriate sufficient funds to pay the rentals over and above fees, etc. received by the agencies, and the leases were to run for thirty years; and, the court noted " * * * the far greater portion (of the rental money) *will arise from a general levy*" (parentheses and italics are ours). In Ayer et al. v. Commissioner, supra, the leasing by the Authority to the Commonwealth of Massachusetts for presumably twenty-three years was apparently mandatory, and the lease was to be automatically extended until the bonds were paid; also, the building was to become the property of the state when the bonds were paid, and the state was made directly liable for all deficiencies above the ordinary rentals (this being designated as "additional rent") until an amount was realized sufficient to satisfy the bonds. There also the arrangement was held actually to be a "borrowing" on account of an instalment purchase. In Trujillo, supra, the court construed the term "debt," in a constitutional sense to mean: "'* * * a debt pledging for its repayment the general faith and credit of the state or municipality, as the case may be, and contemplating the levy of a general property tax as the source of funds with which to retire the same. * * * the debt whose contracting is inhibited is one which *may* engage the general taxing power of the state or municipality for its repayment.'" The court further noted, loc. cit. 448: "This would mean; so long as the agencies did not recede from the lease agreements under the one specified condition, that future legislatures would be bound to provide appropriations for payment of rentals. Such would not be within the conception of expense under a lease as current expense; and a legislature cannot tie the hands of another legislature." The building was to be erected on state land, and the state was to appropriate the money, though from the building fund. The court queried —"How could the state appropriate money it did not own * * *?" Many other things were noted pointing to a direct state operation of the project, and, indirectly, to the assumption of a state debt. The Commission there actually had very limited authority. However, the court apparently had a little difficulty in distinguishing a previous case, State ex rel. Capitol Addition Building Commission v. Connelly, 39 N.M. 312, 46 P.2d 1097, 100 A.L.R. 878. In Griffith, supra, the facts involved, generally, improvements and additions to existing state buildings on state land, and the case is hardly applicable; and there the Department of Public Welfare was held to have an absolute obligation to liquidate the bonds, which were chargeable against its whole income.

Appellants have cited three cases as discussing constitutional limitations upon "liabilities" or "liability." These are: Bell v. City of Fayette, 325 Mo. 75, 28 S.W.2d 356; McCutcheon v. State Building Authority, 13 N.J. 46, 97 A.2d 663; and Straughan v. City of Coeur D'Alene, 53 Idaho 494, 24 P.2d 321. In Bell, the question was whether the purchase of new equipment for a municipal light plant, to be paid for solely out of additional earnings, constituted an *indebtedness* in excess of the city's current

revenue under § 12, Art. 10 of the 1875 Constitution. The court held that it did not, noting that no special or general tax could be levied; it went on, however, to make the statements relied on here (largely as dicta and relying upon an Idaho case) to the effect that the city might be "liable" for a failure to carry out its contract and that this might conceivably be enforced by mandamus; it further noted, however, that "such liability would not be a debt created by the contract." The implication was that "liability" is broader than "debt," and ordinarily this is true. We find nothing in the case which should be binding here or overly persuasive. McCutcheon, supra, involved the New Jersey constitutional provision forbidding, under certain conditions, the creation of "a debt or debts, liability or liabilities" of the State, as well as certain other provisions not material here. The essential holding was that under the peculiar facts there present the supposed leasing arrangement was a purchase by the state, but we fail to find that the decision was based upon any expressed distinction between liabilities and debts. Essentially, as we read the case, the obligation was held to be a *debt*. The court, although noting the presence of the term "liability," said, loc. cit. *672, 673*: "The course pursued here is at variance with the essential quality and meaning of the constitutional debt limitation. * * * By the device used in the case now before us, the constitutional debt-limitation provision would be subverted, and made utterly vain." The Authority there could only lease to the state or its agencies, the contracts of the agencies were made binding upon them even in "the lack of an appropriation," authority was given to mortgage the real estate, the state pledged that it would not restrict the Authority's rights, sites for buildings were to be selected by designated state officials, and the project contemplated twenty-year leases; also, the state convenanted that on each annual budget it would include the amount of the rentals required. Even upon these exaggerated facts there was a strong

dissent by two judges. Straughan, supra, involved the purchase by two cities of a water system and a lighting system. The ultimate holding there seems to be that under the proposed contracts *contingent debts* of the cities might thereby be incurred which would require a general tax, and that the court thus construed the term "liability." We are not persuaded by these cases last discussed that the term "liability" *as used in our context,* means anything more than we have already indicated.

Appellants suggest also the existence of a liability of the state because the rentals will be paid from funds appropriated to the various state agencies and taken from revenue raised by taxation. We note here, that *no rent* can be paid by any agency (in the absence of other possible income) until and unless the legislature has seen fit to make an appropriation to it for its general support, operation, and maintenance for a specific biennium. Nor, indeed, can any agency now pay its rent until that has been done. When such an appropriation has been made, the agency may use the money to pay rents (as they are doing now) or salaries, buy office supplies, etc. This money, when so appropriated and received, has lost its character as general state revenue. See, generally, Opinion of the Justices, 252 Ala. 465, 41 So.2d 761, loc. cit. 763. And it is pure speculation to say that any legislature would impose more taxes for future appropriations on account of this project, than it would otherwise do. It has been held that whether the rentals come from appropriated monies or from the public in fees, etc., is immaterial in so far as our question is concerned. State ex rel. Fatzer v. Armory Board, 174 Kan. 369, 256 P.2d 143; State v. Florida Development Commission, Fla., 84 So.2d 707, loc. cit. 708. And, as held in Loomis v. Keehn, 400 Ill. 337, 80 N.E.2d 368, 370, and State ex rel. Thomson v. Giessel, 271 Wis. 15, 72 N.W. 2d 577, the appropriation and the payment by the state of money to pay current rents do not create a debt; indeed, such is the necessary result of most of the other opin-

ions sustaining enactments similar to this, and already cited.

We do not consider this as a contract of purchase by the state, as some courts, under different facts, have held. No periodic or aggregate payments are fixed; indeed, the Board is not required to enter into leases at all, much less leases for the full term of the bonds. The maturity of such bonds is left elastic in the act (not more than forty years) and provisions are made for refunding. Nor does it appear that the state will directly acquire title. And see, generally, Book v. State Office Building Commission, 238 Ind. 120, 149 N.E.2d 273; Kelley v. Earle, 325 Pa. 337, 190 A. 140; such also is the necessary effect of various other cases already cited.

Appellants have raised a question concerning the taking of title to any real estate acquired, suggesting that if title be taken in the name of the state (as, for instance, under § 8.240) the state would thus become the owner and the arrangement a purchase, with the state renting to its own agencies, thus an anomaly. Section 8.380, authorizing the Board to "acquire by purchase, lease, gift or otherwise * * * real or personal property," and, indeed, to condemn property, appears to be ample authority for the Board to acquire a site in its own name as a "body corporate and politic." For that purpose and to that extent it undoubtedly is an entity. Section 8.380 was enacted ten years after § 8.240 and would normally be controlling, at least in so far as it concerns the Board's authority. We have no question involving the state's title here, for on the resolution now adopted, the Board proposes to acquire a designated site in Kansas City not owned by the state, and presumably in its own name (and, as shown in a pleading filed, from the Land Clearance for Redevelopment Authority). Nor is it shown that title will now or in the future be transferred to the state.

■ We do not decide the principal question here upon the rather narrow argument

that the Board is such a separate legal entity that its debt or liability is not that of the state. There is considerable authority for that position, as already indicated. We hold that "liability" here, as used in § 37, Art. 3, of our Constitution, means, in its true context, a contractual indebtedness, present or future, absolute or contingent, which will be or may be liquidated by general taxation. We do not consider that the power to enforce this contract created by the bonds and the resolution, as given to the bondholders, constitutes such an indebtedness as just defined. We can hardly conceive of a money judgment against the state or the Board in this situation, except for rentals collected and not properly accounted for.

■ The other points raised may be disposed of more briefly. We do not consider that §§ 8.370–8.450 constitute an improper delegation of legislative powers in violation of the separation of powers provided in our Constitution, or under § 1, Art. 3, defining the legislative powers. The principles governing this question are well established, though each case may vary on its facts. As stated by our court in State, on Inf. of Dalton v. Land Clearance for Redevelopment Authority, Banc, Mo., 270 S.W.2d 44, loc. cit. 56: "We conclude that the powers of Authority, as defined in the Act, including the power to prepare plans, to carry out these plans after they have received approval of the governing body, and to determine the fair price at which land within legislatively declared blighted or insanitary areas may be sold are administrative details and were properly delegated to Authority as an administrative agency of the governing body. See Ex parte Williams, 345 Mo. 1121, 139 S.W.2d 485, 491." See, also, State ex rel. Priest v. Gunn, Banc, Mo., 326 S.W.2d 314, loc. cit. 321 et seq.; Spitcaufsky v. Hatten, Banc, 353 Mo. 94, 182 S.W.2d 86, 109, 160 A.L.R. 990; Borden Co. v. Thomason, Banc, Mo., 353 S.W.2d 735, 758; 16 C.J.S. Constitutional Law § 138, p. 575, and pp. 622–623. The courts of other states have, in

several of the cases already cited, specifically denied this contention in the construction of statutes similar in nature. Book v. State Office Building Commission, 238 Ind. 120, 149 N.E.2d 273; Preston v. Clements, 313 Ky. 479, 232 S.W.2d 85; McArthur v. Smallwood, 225 Ark. 328, 281 S.W.2d 428; Holmes v. Cheney, 352 S.W.2d 943 (Ark.); Loomis v. Keehn, 400 Ill. 337, 80 N.E.2d 368; Geboski v. Montana Armory Board, 110 Mont. 487, 103 P.2d 679; Kelley v. Earle, 325 Pa. 337, 190 A. 140; Texas National Guard Armory Board v. McCraw, Atty. Gen., 132 Tex. 613, 126 S.W.2d 627. Our legislation sufficiently declares and defines the conditions under which the Board may act, its powers, and the legislative will; the detailed determinations may properly rest in the Board's discretion.

■ It is also contended that the issuance of the bonds and the statutes under which they are proposed to be issued are violative of §§ 38(a) and 39, Art. 3 of the Mo. Constitution, in that such action would constitute a lending of the state's credit. The prohibition is against a lending of credit to any "private person, association or corporation" (§ 38(a) or to "any person, association, municipal or other corporation" (§ 39). Appellants seem to concede that this argument would only be applicable if we should hold that the Board was an entity wholly separate and distinct from the state. We have not so held, and the point requires no further discussion.

■ Three points remain. Appellants say: (4) that the proposed resolution, and §§ 8.370–8.450 are violative of § 36, Art. 3, which requires that "All revenue collected and money received by the state" be deposited in the treasury; (5) that these statutes are violative of § 28, Art. 4 which provides the sole method of withdrawal of money from the state treasury, namely, by appropriation, certification and warrant; and (6) that the resolution designating the State Treasurer as "the custodian of funds" is violative of § 15, Art. 4, which provides

that "No duty shall be imposed on the state treasurer by law which is not related to the receipt, investment, custody and disbursement of state funds."

We may clarify the consideration of these points by stating that these monies are (or will be), of course, "state funds," by way of contrast with private funds; but they will consist of the proceeds of the sale of the bonds and money received by the Board from state agencies solely as rent. These funds will not constitute any part of the general revenue. In State ex rel. Thompson v. Board of Regents, Banc, 305 Mo. 57, 264 S.W. 698, it was sought to force the respondents to pay into the treasury insurance money which they had collected; that action was taken pursuant to a provision of the 1875 Constitution similar to the present § 36, Art. 3. The court declined to issue the writ. In so doing, it defined "revenue" as follows: "By revenue, whether its meaning be measured by the general or the legal lexicographer, is meant the current income of the state from whatsoever source derived which is subject to appropriation for public uses." We shall deal first with the rentals to be received. While the term "money" as used in § 36, Art. 3 is broader than revenue, the rent payments (when they reach the Board) will have already been withdrawn from the general revenue by regular appropriations, assigned to specific agencies or departments for their general support, and thus made subject to their disbursement; a portion of this money will thereafter be regularly requisitioned by the respective agencies and applied as rent. That final payment will, under the present proposal, presumably be made to the Board. In its hands and in the hands of the Treasurer as custodian these funds partake of the nature of a trust, for the Board has solemnly contracted their application to the stated purposes.

The existence of special funds in the treasury has long been recognized. State ex rel. Fath v. Henderson, 160 Mo. 190, 60 S.W. 1093. Indeed certain funds (as the state's contributions to the Employees' Re-

tirement Fund) when once included in a regular appropriation are remitted directly to the respective Boards or Trustees for their own deposit and handling. See Sections 104.310–104.600. The rental funds in our case, having once been appropriated, requisitioned for the operations of the agencies, and paid to the Board, need not be appropriated again before being applied to the contracted purposes. The Board, while it is an agency of the state, has been constituted a "body corporate and politic" and certainly it has been made an entity for the purpose of holding funds in a separate capacity, as it may do with the real estate. The Board here has chosen to leave these funds in the custody of the State Treasurer, —but as custodian, as we understand, and not as a part of the treasury funds. This is proper under § 15, Art. 4 of the Constitution, and the Treasurer has expressed his cooperation. The Board will presumably order the funds applied, as contracted, by the custodian. We have held that the state has contracted no liability by reason of the issuance of these bonds or the adoption of the resolution of the Board. It would seem, therefore, that neither it nor those presuming to act in its behalf, should have the right to insist that the rentals should be put in the treasury and again appropriated in a useless circle.

The proceeds of the sale of the bonds stand upon a somewhat different footing. Broadly speaking, that is state "money." It will not have been appropriated by the legislature at any time under the present resolution. We hold that this part of the Board's money is subject to § 36, Art. 3, that it should be placed in the state treasury when realized, and appropriated to the Board for its use in the construction of the building and the attendant expenses. This money is also charged with a trust, but it differs from the rentals in that it would not have passed through the treasury at any time and would not have been withdrawn therefrom by appropriation. This, of course, will necessitate a modification of the resolution.

▮ We recognize and approve the holding in State ex rel. Thompson v. Board of Regents for Northeast Missouri State Teachers' College, 305 Mo. 57, 264 S.W. 698, that certain monies of the State College need not be paid into the state treasury. This holding was essentially based upon the idea that these institutions, although they are instrumentalities of the State, are not the State itself nor does the State act through them in its "sovereign capacity," and that their funds (except appropriated monies) are not essentially "state money." In defining the latter term the court said: " * * * or, as aptly put ·by the respondent, state money means money the state, in its sovereign capacity, is authorized to receive, the source of its authority being the Legislature. * * * " We have also noted the ruling in State ex rel. Curators of University of Missouri v. McReynolds, 354 Mo. 1199, 193 S.W.2d 611, to the effect that the Curators of the University had the implied power, even before the appropriate legislation was enacted, to issue revenue bonds for the building of dormitories. That opinion seems to infer that the Curators might handle the proceeds of such bonds as their own funds. On the other hand, this court held in State ex rel. McKinley Pub. Co. v. Hackmann, Banc, 314 Mo. 33, 282 S.W. 1007, that the Highway Commission was a "subordinate branch of the executive department," even before the 1945 Constitution which expressly classifies it as such. And the proceeds of Highway Bonds go into the State Treasury as a trust fund and are appropriated for highway purposes. (Laws 1923, p. 45, § 118.)

We have no quarrel with any of those rulings, but we are convinced that in the present case the State is really acting in its "sovereign capacity" through the Board of Public Buildings to establish and maintain a home for its various departments and agencies. It would be hard to conceive of a more concrete example of the exercise of the State's paramount, govern-

mental functions than that exercised here through a Board which is actually a branch of its executive department. This project constitutes a function essentially different from those of the institutions of higher learning, and our ruling here is not applicable to their revenue bonds. (See Thompson, supra.) When the proceeds of the present bonds reach the treasury, they need not thereafter be appropriated under the provisions of subsections "first" to "eighth" of Section 36, for they constitute a *trust fund*. They should be appropriated solely to and for the use of petitioner, for its purposes and upon its order or orders.

Inasmuch as all this money is in the nature of a special state fund, we see nothing violative of the substantive intent and meaning of § 15, Art. 4 in designating the State Treasurer as the one to have custody of the funds. This applies to the rentals and, if the Board chooses, to the proceeds of the bonds *after* an appropriation has been made. The constitutional provision is that "No duty shall be imposed upon the state treasurer by law which is not related to the receipt, custody and disbursement of state funds." The statutes in question do not provide that the State Treasurer shall be the custodian; in fact, they are silent as to the custody. The *law* has not imposed this duty on the Treasurer; and the prohibition runs against the legislature. There has certainly been no express violation of § 15, Art. 4 of the Constitution. There was no similar provision in the 1875 Constitution, and the background of the 1945 provision lies in the prior history of a building up of the power and patronage of elected officials by giving to them new functions and duties. One purpose of the new constitution was to limit and define the scope and duties of all executive officials (see § 12, Art. 4,) agencies, and departments, including elected officials. A similar prohibition was imposed as to the State Auditor (§ 13) and the Secretary of State (§ 14). We hold, upon the interpretation stated

above, that by the present proposal the essential and substantive duties of the Treasurer are not altered or extended.

We thus deny the assertions of invalidity attributed to §§ 8.370–8.450; we also find the resolution of the Board to be valid except to the extent heretofore indicated. We certainly express no opinion concerning the wisdom of this venture or concerning the age-old argument about the desirability of being an owner or a tenant of real estate. Those problems, we may happily say, are for the legislature.

The judgment should be modified to the extent indicated in this opinion. Otherwise it is affirmed.

All of the Judges concur except STORCKMAN, J., who dissents in separate dissenting opinion.

STORCKMAN, Judge (dissenting).

In my opinion the proceeds of the revenue bonds in question are not "revenue collected and money received by the state" within the meaning of Art. III, § 36, of the Constitution of Missouri, and therefore need not go into the state treasury and be subject to appropriation. It is my view that the Board of Public Buildings is legally entitled to hold such proceeds in trust and to use them without appropriation for the purposes which the general assembly has previously authorized and designated by §§ 8.370 to 8.450, RSMo 1959, V.A.M.S. State ex rel. Thompson v. Board of Regents for Northeast Missouri State Teachers' College, 305 Mo. 57, 264 S.W. 698, 699–700 [1–4]. I can see no valid distinction between the proceeds of the revenue bonds and the rental revenue of the completed office building which the Board is authorized to collect and apply to the payment of the bonds.

Therefore, I respectfully dissent from that portion of the opinion which holds to the contrary.