**STATE ex rel. Thomas REDMOND, et al., Appellants,**

v.

**STATE of Missouri, et al., Respondents.**

**No. WD 70836.**

Missouri Court of Appeals, Western District.

Jan. 11, 2011.

Motion for Rehearing and/or Transfer to Supreme Court March 1, 2011.

Richard W. Miller, Esq., Kansas City, MO, for appellant.

Robert L. Presson, Esq., Jefferson City, MO, for respondent.

Before: JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA and CYNTHIA L. MARTIN, JJ.

ALOK AHUJA, Judge.

Thomas Redmond and Margaret Redmond appeal from a judgment on the pleadings granted to the defendants on their declaratory judgment, accounting, and mandamus claims. We affirm.

## Factual Background

The Redmonds' petition asserts claims concerning the disposition of monies received under the Master Settlement Agreement that Missouri, as well as forty-five other states and several territories, entered into with the five largest tobacco companies in November 1998. Under the Agreement, the tobacco companies agreed to make certain annual monetary payments, in perpetuity, to the settling states and territories. According to the Redmonds' petition, the State began receiving its share of proceeds under the Agreement in Fiscal Year ("FY") 2001, and had received a total of more than $1 billion through the end of FY 2006.

In 2003, the Missouri General Assembly enacted § 196.1100.[1] The statute creates the Life Sciences Research Trust Fund (the "Fund") in the state treasury, and directs that, beginning in FY 2007 and in perpetuity thereafter, the Treasurer shall deposit 25% of the monies received from the Agreement into the Fund. *See* § 196.1100.1. The statute also specifies that "[m]oneys in the fund shall not be subject to appropriation for purposes other than those provided in sections 196.1100 to 196.1300 without a majority vote in each house of the general assembly." *Id.*

The Redmonds, who are husband and wife, each suffer from illnesses which would or could be the subject of scientific research funded by the Fund. They claim to be direct and intended beneficiaries of § 196.1100 by virtue of their status as Missouri citizens, taxpayers, and residents. The Redmonds allege that, beginning with settlement proceeds attributable to FY 1998, the State deposited substantially less money in the Fund than required by

---

1. Unless otherwise indicated, statutory references are to the RSMo 2000 as updated through the 2009 Cumulative Supplement.

§ 196.1100. They also contend that the State has expended Fund monies for purposes, such as plant and animal research, which are not authorized by §§ 196.1100–196.1130.

The Redmonds' petition names as defendants the State, the Missouri Legislature, and the State Treasurer. The petition asserts three claims. In Count I, captioned "Declaratory Relief," the Redmonds allege that, under § 196.1100:

> moneys received from the Settlement Agreement are to be deposited by the State Treasurer into the Life Sciences Research Trust Fund and are trust moneys which are untouchable and may not be tampered with by the Legislature or the State Treasurer under the law and are to be used solely for and by the Life Sciences Research Trust Fund "to perform research to better serve the health and welfare of the residents of the State of Missouri" and "the moneys in the fund shall not revert to the credit of general revenue."

Although ostensibly seeking a declaratory judgment, Count I prays for a judgment requiring the State and State Treasurer "to pay to the Life Sciences Research Trust Fund the principal sum of $283,364,-390 [2] plus interest." In Count II, the Redmonds seek

> an accounting by the State Treasurer and the Legislature of their allocations and usage of all the funds generated and received by the State and the State Treasurer under the Master Settlement Agreement with the tobacco companies and the State Treasurer and the Legislature should be ordered to restore, allocate and use all those funds for their intended purpose ... of improving the health of the residents of the State, al-

leviating the enormous health problems caused by tobacco and implementing programs to prevent tobacco use.

Finally, in Count III the Redmonds seek a writ of mandamus ordering the State Treasurer and legislature to comply with their obligation to deposit 25% of the settlement proceeds into the Fund and, "once an accounting has been rendered, to perform the ministerial duty to restore, allocate and use the funds generated by the Settlement Agreement for their intended purposes."

After answering, the State filed a Motion for Judgment on the Pleadings, and the Treasurer filed a Motion for Partial Summary Judgment. The circuit court granted the State's Motion for Judgment on the Pleadings and entered judgment in favor of all defendants on all claims. The court's judgment found that the suit was barred by sovereign immunity. It also rejected the Redmonds' argument that § 196.1100 imposed merely "ministerial duties" on the defendants which the court could enforce by mandamus. This appeal follows.

## Standard of Review

■■■ The entry of judgment on the pleadings is authorized by Rule 55.27(b). "The question presented by a motion for judgment on the pleadings is whether the moving party is entitled to judgment as a matter of law on the face of the pleadings." *RGB2, Inc. v. Chestnut Plaza, Inc.,* 103 S.W.3d 420, 424 (Mo.App. S.D.2003). "The well-pleaded facts of the non-moving party's pleading are treated as admitted for purposes of the motion." *Eaton v. Mallinckrodt, Inc.,* 224 S.W.3d 596, 599 (Mo. banc 2007). Because a judgment on the

---

2. Although it is not entirely clear from the record, this figure apparently represents 25% of the total sum the Redmonds allege the State has received, or will receive, under the Agreement through the conclusion of the 2008 Fiscal Year.

pleadings addresses an issue of law, our review is *de novo;* we grant no deference to the circuit court's ruling. *Cures Without Cloning v. Pund,* 259 S.W.3d 76, 80 (Mo.App. W.D.2008).

## Analysis

Section 196.1100 provides:

1. There is hereby established in the state treasury the "Life Sciences Research Trust Fund" to be held separate and apart from all other public moneys and funds of the state.... The state treasurer shall deposit into the fund twenty-five percent of all moneys received from the master settlement agreement, as defined in section 196.1000, beginning in fiscal year 2007 and in perpetuity thereafter. Moneys in the fund shall not be subject to appropriation for purposes other than those provided in sections 196.1100 to 196.1130 without a majority vote in each house of the general assembly. All moneys in the fund shall be used for the purposes of sections 196.1100 to 196.1130 only. Notwithstanding the provisions of section 33.080, RSMo, to the contrary, the moneys in the fund shall not revert to the credit of general revenue at the end of the biennium.

2. Moneys in the life sciences research trust fund shall be used strategically ... to enhance the capacity of the State of Missouri's ability to perform research to better serve the health and welfare of the residents of the state of Missouri as a center of life sciences research and development by building on the success of research institutions located in Missouri, creating in and attracting to Missouri new research and development institutions, commercializing the life sciences technologies developed by such institutions, and enhancing their capacity to carry out their respective missions.

Section 196.1109 provides that "[a]ll moneys that are appropriated by the general assembly from the life sciences research trust fund shall be appropriated to the life sciences research board to increase the capacity for quality of life sciences research at public and private not-for-profit institutions in the state of Missouri."

## I.

▆ The Redmonds contend, first, that the circuit court erred in determining that their claims are barred by sovereign immunity. They argue that the State waived sovereign immunity by enacting § 196.1100. In making this argument, the Redmonds rely on *Crain v. Missouri State Employees' Retirement System,* 613 S.W.2d 912 (Mo.App. W.D.1981), and *V.S. Dicarlo Construction Co. v. State,* 485 S.W.2d 52 (Mo.1972).

The resolution of the Redmonds' sovereign immunity arguments is controlled by *State ex rel. Kansas City Symphony v. State,* 311 S.W.3d 272 (Mo.App. W.D.2010), which involved very similar claims of legislative underfunding of the Missouri Arts Council Trust Fund. The statute at issue in that case, § 143.183.5, stated in relevant part:

For fiscal year 2000, and for each subsequent fiscal year for a period of sixteen years, sixty percent of the annual estimate of taxes generated from the nonresident entertainer and professional athletic team income tax shall be allocated annually to the Missouri arts council trust fund, and shall be transferred from the general revenue fund to the Missouri arts council trust fund established in section 185.100, RSMo....

In *Kansas City Symphony* the plaintiff-appellant argued, also in reliance on *Crain* and *Dicarlo,* that the State had waived

sovereign immunity not only by enacting § 143.183.5, but also because the Arts Fund had entered into an incentive matching agreement with the plaintiff-appellant, promising to match contributions received by the plaintiff-appellant through certain of its fund-raising activities. 311 S.W.3d at 275.

*Kansas City Symphony* rejected the plaintiff-appellant's sovereign immunity claims. The Court emphasized that "[a]ll waivers of sovereign immunity are to be strictly construed." *Id.* at 276. The Court noted that there was no express waiver of sovereign immunity in § 143.183.5, such as that found in the statutory "sue or be sued" clause at issue in *Crain. Id.* at 275. Next, the Court found that *Crain* and *Dicarlo* "involve[d] clear contract principles that do not exist in this case." *Id.* at 276. The Court noted that the *Kansas City Symphony* lawsuit had not been filed against the Arts Fund or its trustees seeking enforcement of the incentive matching agreement, that there was no indication that the legislature—as opposed to the fund's trustees—had authorized entry into the agreement, and that the agreement itself specified that matching funds were "subject to appropriation." *Id.*

The Redmonds' sovereign immunity arguments are weaker than the plaintiff-appellant's in *Kansas City Symphony.* While the mandate requiring transfer of monies to the Fund in § 196.1100.1 is similar to the statutory mandate at issue in *Kansas City Symphony,* in the earlier case we found that such a statute—even in conjunction with an incentive matching agreement which is lacking here—did not rise to the level of a waiver of sovereign immunity. *A fortiori,* the Redmonds, who can point to no specific agreement with the Fund promising them money from the Fund, cannot claim that § 196.1100.1 creates a contract or benefit enforceable in

the courts. Moreover, as in *Kansas City Symphony,* the Redmonds can point to no *express* waiver of sovereign immunity like that at issue in *Crain.* We reject the Redmonds' sovereign immunity arguments for the same reasons that we rejected the similar arguments in *Kansas City Symphony.*

■ The Redmonds argue that the defendants have mandatory duties under §§ 196.1100.1 and 196.1109 to transfer monies to the Fund and appropriate those funds for life sciences research, that those mandatory duties are enforceable through a writ of mandamus, and that a mandamus action is not subject to sovereign immunity. The plaintiff-appellant in *Kansas City Symphony* made a similar argument. While we acknowledged "that mandamus is an appropriate remedy to compel public officials to perform specific 'ministerial' or mandatory duties," we held that the plaintiff-appellant could not demonstrate such a ministerial duty "[b]ecause the transfer of funds under Section 143.183.5 was subject to appropriation." *Kansas City Symphony,* 311 S.W.3d at 276. Any legislative obligation to allocate money to the Arts Fund was accordingly discretionary, and mandamus was inappropriate. *Id.* For reasons discussed in § II, below, we reach the same conclusion here.

## II.

The Redmonds argue that § 196.1100.1's directive that "[t]he state treasurer *shall* deposit into the fund twenty-five percent of all moneys received from the master settlement agreement," and § 196.1109's command that monies appropriated from the Fund "*shall* be appropriated to the life sciences research board" for specified purposes, established a mandatory duty to deposit a portion of the settlement proceeds into the Fund for use for the purposes enumerated in §§ 196.1100–

196.1130, without the need for any further appropriation, and that this mandatory duty is enforceable through a writ of mandamus. Once again, we conclude that *Kansas City Symphony* requires rejection of the Redmonds' argument.

█ As we noted in *Kansas City Symphony,* the use of the term "shall" in a statute "generally connotes a mandatory duty." 311 S.W.3d at 277. "Whether the use of the word 'shall' in a statute is considered mandatory or directory, however, is primarily a function of context and legislative intent." *Id.*

*Kansas City Symphony* concluded that the "context and legislative intent" of § 143.183.5 established that the legislature had discretion as to allocation of monies to the Arts Fund. The statute at issue in *Kansas City Symphony,* like § 196.1100.1, appears to state in mandatory and unqualified terms that specific monetary receipts of the State *must* be transferred into the designated trust fund. Indeed, in *Kansas City Symphony* the statutory obligation to allocate monies to the fund had been amended in 2003 to *delete* the qualification that the transfer of funds was "subject to appropriation." *See* § 143.183.5, RSMo 2000. The Court recognized that the deletion of this phrase "certainly supports the Symphony's argument that the Legislature intended that tax revenue be automatically transferred from the general revenue fund to the Arts Trust Fund." *Kansas City Symphony,* 311 S.W.3d at 277. Nevertheless, the Court looked to a separate statutory provision, § 185.100.1, which provides that *"[s]ubject to appropriations,* moneys in the fund shall be used solely for the promotion of the arts in Missouri." (Emphasis added.) The Court also noted that "[t]he Legislature's practice from the inception of the Arts Trust Fund has been to implement the provisions of these two statutory sections by transferring funds in an

appropriations bill—another indication that it did not intend to exempt these general revenue funds from that process." *Kansas City Symphony,* 311 S.W.3d at 277 (footnote omitted).

█ *Kansas City Symphony* also held that interpreting § 143.183.5 as creating a mandatory duty to transfer monies into the Arts Fund would raise constitutional concerns. Recognizing a mandatory obligation, we held, would have the effect of creating "a perpetual or automatic continuing appropriation," in violation of the provisions of the Missouri constitution, in particular article III, § 36 and article IV, §§ 23 and 28, which specify that monies can only be withdrawn from the treasury by appropriation, and that appropriations can be made for no more than two fiscal years. *Kansas City Symphony,* 311 S.W.3d at 278.

> The policy underlying the constitutional appropriations requirement is that each legislature must have discretion to respond to the financial needs of the times. As the Supreme Court observed in [*State ex rel.*] *Fath* [*v. Henderson,* 160 Mo. 190, 60 S.W. 1093 (1901)], "one general assembly cannot tie the hands of its successor[.]" 60 S.W. at 1097.

*Id.* at 278. In order to avoid these constitutional difficulties, *Kansas City Symphony* held that "the language of Section 143.183.5 indicating that the general revenue funds 'shall be allocated' and 'shall be transferred' to the Arts Trust Fund is directory, rather than mandatory, and does not supplant the appropriations process." *Id.* at 277.

The primary considerations on which *Kansas City Symphony* relied are equally applicable here. As in *Kansas City Symphony,* while the provision specifying that money must be transferred *into* the Fund may appear mandatory and unqualified, the statutory provisions specifying the use

or disbursement of monies *from* the Fund makes clear that such disbursements are subject to the legislature's appropriations power. The statutory provision governing the use of monies contained in the Fund states that "[a]ll moneys *that are appropriated by the general assembly* from the life sciences research trust fund *shall be appropriated* to the life sciences research board" for specified purposes. § 196.1109 (emphasis added). Section 196.1109 goes on to specify the maximum percentage "of the moneys appropriated" that may be spent on construction of physical facilities, and the percentages that must be "appropriated" "to build research capacity," "to promote life science technology transfer and technology commercialization," and for "research of tobacco-related illnesses." Other references throughout §§ 196.1100–196.1130 make clear that the General Assembly plainly contemplated that no monies would actually be expended from the Fund without the intervention of the appropriations process, just as in *Kansas City Symphony*.[3] Consistent with these provisions, the legislature has authorized the expenditure of money in the Fund through appropriations bills. *See, e.g.,* H.B. 7, § 7.020, 2007 Mo. Laws 54, 56; H.B. 11, § 11.440, 2007 Mo. Laws 116, 129–30.

■ The Redmonds contend that, under § 196.1109, the legislature can appropriate money from the Fund *only* to the Life Sciences Research Board. We disagree.

If anything, § 196.1100.1 makes even clearer than the statutes at issue in *Kansas City Symphony* that future legislatures retain the authority to use settlement proceeds from the Master Tobacco Settlement Agreement for purposes *other than* funding the Board's activities. In *Kansas City Symphony,* we concluded that the General Assembly retained the power to appropriate the funds at issue for purposes other than the Arts Fund by citing to constitutional principles and the Supreme Court's decision in *Fath. See Kansas City Symphony,* 311 S.W.3d at 277–78. Here, however, the ability of future legislatures to appropriate the settlement proceeds to other purposes is explicit in § 196.1100.1 itself: "Moneys in the fund shall not be subject to appropriation for purposes other than those provided in sections 196.1100 to 196.1130 without a majority vote in each house of the general assembly." While this provision is stated in the negative and may appear to *restrict* future legislatures' power to appropriate monies to other purposes, it does no such thing, because the legislature's exercise of its appropriations power—like its ability to enact substantive legislation—has always required a majority vote in each house of the General Assembly. Mo. Const. art. III, § 27. Section 196.1100.1 adds no additional restriction on the legislature's exercise of its appropriations power than already existed.[4]

---

3. *See, e.g.,* § 196.1103 (specifying that "[t]he management, governance, and control of moneys appropriated from the life sciences research trust fund shall be vested in the 'Life Sciences Research Board'"); § 196.1112 (specifying multiple limitations on the use of "the moneys appropriated to the board"); § 196.1115.1 (specifying disposition of "[t]he moneys appropriated to the life sciences research board that are not distributed by the board in any fiscal year"); § 196.1121.1 (imposing restrictions on "[g]rant or contract awards made with moneys appropriated from the life sciences research trust fund"); § 196.1127.1, .3 (prohibiting use of public funds for research projects "that involve[ ] abortion services, human cloning, or prohibited human research"; specifying that "[t]he moneys appropriated to the life sciences research board pursuant to sections 196.1100 to 196.1124 shall be subject to the provisions of this section").

4. The Redmonds cite *State Highway Commission v. Spainhower,* 504 S.W.2d 121 (Mo.

Interpreting § 196.1100 to entirely exempt a portion of the tobacco settlement proceeds from the appropriations process would raise the same constitutional concerns as in *Kansas City Symphony.* While the funds at issue here come from a litigation settlement, rather than from taxes, this is a distinction without a difference, since article III, § 36 of the Missouri Constitution provides that "[a]ll revenue collected *and money received* by the state shall go into the treasury" (emphasis added), and may only be withdrawn by way of the legislative appropriations process. The same constitutional principles implicated in *Kansas City Symphony*—that appropriations are of limited duration, and that one legislature cannot constrain the appropriations authority of future legislatures—require that we reject the Redmonds' arguments here.

The Redmonds argue that reading the word "shall" as merely directory would lead to absurd consequences. Specifically, they note that the statutory limitations on the Life Sciences Research Board's use of appropriated funds are also expressed using the word "shall." *See, e.g.,* § 196.1127.3 ("Public funds *shall not* be expended, paid, or granted to or on behalf of an existing or proposed research project that involves abortion services, human cloning, or prohibited human research."). The Redmonds argue that, if we interpret "shall" as being directory rather than mandatory, this would permit the Board to spend money without statutory constraint.

 The manner in which the Board may spend the funds appropriated to it is not presently before us. Further-

more, the Board and the Legislature do not stand on the same footing with respect to statutory directives or commands. While a previous legislature cannot bind a future legislature's appropriations authority for the reasons fully explained in *Kansas City Symphony,* a legislature can surely impose limitations on the use to which an entity such as the Board puts appropriated funds. Thus, when a previous legislature tells a future legislature that it "shall" appropriate money in a particular fashion, that "shall" is not mandatory, but directory. But when the legislature tells a subordinate body such as the Board that it "shall" do something, that directive may well be mandatory and binding. There is no inconsistency in interpreting the word "shall" differently, depending on the entity to which a statutory command is directed.

The references in § 196.1100.1 to the creation of a "trust fund" do not distinguish this case from *Kansas City Symphony.* There too, the controlling statute referred to a "trust fund." *See* § 143.183.5 ("[S]ixty percent of the annual estimate of taxes generated from the . . . tax shall be allocated annually to the Missouri arts council *trust fund* . . . ." (emphasis added)). Citing to *Board of Public Buildings v. Crowe,* 363 S.W.2d 598, 607–08 (Mo. banc 1962), on which the Redmonds also rely, we held that monies in the Arts Fund were subject to appropriation before disbursement, even though they "were considered to be in the nature of a trust fund." *Kansas City Symphony,* 311 S.W.3d at 279. Such funds are only "classified as special trust funds subject to disbursement for their stated purpose" *after*

1973), for the proposition that §§ 196.1100–196.1130 can lawfully limit the purposes for which future legislatures may appropriate money in the Fund. But *Spainhower* held that the legislature was prohibited by article IV, § 30(b) of the Missouri Constitution from di-

verting investment income earned on state road fund monies to other purposes. *Id.* at 125–26. The General Assembly is subject to no similar constitutional limitation with respect to monies in the Fund.

appropriation of those funds by the legislature. *Id.*[5]

We recognize that § 196.1100.1 arguably differs from § 143.183.5 in one important respect. While § 143.183.5 specifies that certain funds derived from an identified tax "shall be transferred *from the general revenue fund* to the Missouri arts council trust fund" (emphasis added), § 196.1100.1 provides that "[t]he state treasurer shall deposit into the [life sciences research trust] fund twenty-five percent of all moneys received from the master settlement agreement." Section 196.1100.1 does not refer to the *transfer* of monies from the general revenue fund into another designated fund, but instead appears to require that a portion of the proceeds of the Master Settlement Agreement be deposited *directly* into the Fund.[6] It could be argued that the Treasurer's duty to deposit specific monies *into* the Fund is a mandatory obligation enforceable by mandamus, even though the disbursement of those monies *from* the Fund could only be authorized by the General Assembly's discretionary exercise of its appropriations authority. The Redmonds have not argued, however, that the Treasurer's statutory duty to deposit money *into* the Fund should be enforced separate and apart from the purposes for which money is disbursed *from* the Fund. Instead, their consistent claim on appeal has been that monies must be deposited into the Fund so that those monies become "untouchable trust funds," subject to expenditure only for the purposes specifically identified in §§ 196.1100–196.1130. In addition, we question whether the Redmonds would be entitled to seek an extraordinary writ of mandamus to order that money be deposited by the Treasurer into a specifically designated fund, when the General Assembly retains plenary authority as to the ultimate use to which those funds are put. "A writ of mandamus is not proper when the relief it affords will be ineffective or useless. 'A court will not award a discretionary writ [of mandamus] ... for the mere purpose of determining an empty and barren technical right on behalf of a petitioner,' or where the writ would be 'useless.'" *State ex rel. KelCor, Inc. v. Nooney Realty Trust, Inc.*, 966 S.W.2d 399, 403 (Mo.App. E.D.1998) (quoting *Barth v. Clay*, 354 Mo. 90, 188 S.W.2d 660, 662 (1945)). In any event, because the Redmonds have not separately argued for enforcement of any duty to deposit monies into the Fund, we need not definitively resolve these issues.[7]

---

5. As explained in *State ex rel. Kessler v. Hackmann*, 304 Mo. 453, 264 S.W. 366, 367 (1924):

> [T]his court has held that a fund, raised by an act for a special purpose, could not be paid out of the state treasury except upon an appropriation by an act of the Legislature.... [T]he creation of a special fund is not a continuing appropriation of the fund, or of any part of it, to pay accounts drawn against it.... [T]he creation of the fund is one thing, and the appropriation of money to pay accounts against the fund is quite another thing.

6. By directing the Treasurer to deposit the tobacco settlement proceeds into a special fund within the treasury, § 196.1100.1 apparently operates as an exception to the general rule that funds received by the State be deposited in the general revenue fund. *See* § 33.543 ("All moneys received by this state shall be deposited in the state treasury to the credit of the general revenue fund, *unless required by statute* or constitutional provision *to be deposited in some other specifically named fund.*" (emphasis added)).

7. We note that, in connection with her Motion for Partial Summary Judgment, then-Treasurer Sarah Steelman submitted an affidavit indicating that her office had, in fact, deposited into the Fund 25% of the settlement proceeds paid to the State in FY 2007 and FY 2008. The circuit court did not address this issue because its grant of judgment on the pleadings mooted the Treasurer's Motion for Partial Summary Judgment.

828

## Conclusion

The circuit court's judgment is affirmed.

All concur.